FORM 5. Petition for Review or Notice of Appeal of an Order or Decision of an
Agency, Board, Commission, Office, Bureau

Form 5
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

Anthony L. Armour , **Petitioner or Appellant,**

**v.**

Department of Justice , **Respondent or Appellee.**

## PETITION FOR REVIEW

Notice is hereby given that the following party/parties* Anthony L. Armour

hereby petition(s)/appeal(s) the court for review of the order of the Merits Systems Protection Board entered on 9/29/22 . The order or decision was received on 9/29/22 .

Date: 12/28/22

Signature: /s/Matthew Zorn

Name: Matthew Zorn

Address: Yetter Coleman LLP

811 Main Street, Suite 4100

Houston, Texas 77002

Phone Number: 713-632-8064

Email Address: mzorn@yettercoleman.com

*See Fed. R. App. P. 15(a)(2) for permissible ways of identifying petitioners.

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## DALLAS REGIONAL OFFICE

| | |
|---|---|
| ANTHONY L. ARMOUR,<br>    Appellant, | DOCKET NUMBER<br>DA-0752-20-0509-I-1 |
| v. | |
| DEPARTMENT OF JUSTICE,<br>    Agency. | DATE: September 29, 2022 |

Kevin Byrnes, Esquire, and Rachel Leahey, Esquire, Tysons, Virginia, for the appellant.

Brooke A. DuBois, Esquire, and Clairanne Mariah Porter Wise, Esquire, Springfield, Virginia, for the agency.

### BEFORE
Daniel Yehl
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

Anthony Armour (the appellant) filed an appeal from a decision issued by the Department of Justice, Drug Enforcement Agency (DEA or agency), to remove him from his position as Criminal Investigator, effective July 28, 2020. Initial Appeal File (IAF), Tab 1. The Board has jurisdiction over this appeal. *See* 5 U.S.C. § 7511-13. I conducted the hearing requested by the appellant. IAF, Hearing Transcript 1 (HT-1) and Transcript 2 (HT-2).

For the following reasons, the agency's action is AFFIRMED.

## ANALYSIS AND FINDINGS

Background and Findings of Fact

Preponderant record evidence[1] establishes the following facts.[2]  The agency hired the appellant in February 2004.  IAF, Tab 10 at 40; Tab 16 at 49; Tab 45 at 16 (stipulated fact 1).[3]  At the time of his removal, his position of record was Criminal Investigator (Senior Special Agent), GS-1811-13, with the DEA's Houston Field Division.  *Id*.  In this position, the appellant was responsible for conducting complex criminal investigations into national and transnational drug trafficking organizations.  IAF, Tab 13 at 10-13; Tab 45 at 16 (stipulated fact 2).  Special Agent duties require frequent contact with criminals, informants, large drug quantities, and firearms, and thus are inherently dangerous.  *Id*.

On November 22, 2017, the Substance Abuse and Mental Health Services Administration (SAMHSA) issued a memorandum to "Federal Agency Drug Program Coordinators, Federal Medical Review Officers, and Federal Partners" regarding "Use of Marijuana Oils or Marijuana Infused Commercial products."

---

[1] Preponderant evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is  more likely to be true than untrue.  5 C.F.R. § 1201.4(q).

[2] In resolving issues of credibility, including the weight to be given declarations, written statements and other documentary evidence, I have been guided by *Borninkhof v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981), and *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).  Under *Hillen*, when resolving issues of credibility, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version she believes, and explain in detail why she found the chosen version more credible, considering such factors as:  (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.

[3] The parties may stipulate to any matter of fact. The stipulation will satisfy a party's burden of proving the fact alleged.  5 C.F.R. § 1201.63.

IAF, Tab 12 at 30-31.   The memorandum advised that "CBD products may contain other cannabinoids such as THC, therefore, use of CBD oils and marijuana-derived products may result in a positive urine drug test for THCA."[4] *Id*. at 30.   There is no evidence in the record showing that the DEA distributed this memorandum to its employees.

On December 20, 2018, Congress passed the Agriculture Improvement Act of 2018, Pub. L. 115-334 (hereafter referred to as the "2018 Farm Bill").   In part, the new law changed certain Federal authorities relating to the production and marketing of "hemp," defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."   7 U.S.C. § 1639o(1); IAF, Tab 14 at 9-10; IAF, Tab 45 at 17 (stipulated fact 4).

Marijuana is classified as a Schedule I controlled substance under the Controlled Substances Act (CSA).   21 U.S.C. § 812(b); IAF, Tab 45 at 18 (stipulated fact 11).   However, hemp is not considered to be marijuana or a controlled substance.   21 U.S.C. § 802(16); IAF, Tab 45 at 17 (stipulated fact 4).

Under the SAMHSA "Mandatory Guidelines for Federal Drug Testing Programs," ("Mandatory Guidelines") the drug test cutoff concentration for urine, in relation to marijuana metabolites, is 50 nanograms per milliliter (ng/mL) for an initial test, and 15 ng/mL for a confirmatory test.   IAF, Tab 12 at 52-53.   For the initial test, laboratories test urine with a qualitative panel designed to detect

---

[4] Cannabis is a plant that contains more than eighty biologically active chemical compounds, the most commonly known of which are delta-9-tetrahydrocannabinol (THC) and cannabidiol (CBD)."   IAF, Tab 14 at 9 (*Federal Drug Administration Regulation of Cannabis and Cannabis-Derived Products, Including Cannabidiol (CBD)*).   Tetrahydrocannabinol-carboxylic acid, or THCA, is the marijuana analyte tested in urine.   IAF, Tab 12 at 30.   It is a metabolite of THC, the primary psychoactive constituent of marijuana.   *Id*.

several drugs and drug classes using immunoassay-based methods.  *See id.*; *see also* IAF, Tab 42 at 6.    More sensitive and quantitative tests for specific metabolites are then performed to confirm initial test results.  IAF, Tab 42 at 6.

Between February 2019 and late May 2019, the appellant used a partial bottle of one CBD product (CBDrop 2500), and a full bottle of another product (CBDrop 1000), to assist with the management of pain and symptoms associated with various medical conditions.  HT-2 (Armour); *see also* IAF, Tab 16 at 51, 56-58, 61-62.  He purchased a second bottle of CBDrop 1000 in May 2019, and had begun to use it when the agency randomly selected him for a urine drug test on May 21, 2019.  IAF, Tab 16 at 9-16, 18; Tab 45 at 16 (stipulated fact 3).  A split urine sample (consisting of specimens A and B) was collected from the appellant on that date, and specimen A was sent to Quest Diagnostics Laboratory ("Quest"), a Department of Health and Human Services (HHS)-certified laboratory, for testing.  IAF, Tab 12 at 14-15; Tab 16 at 18-19; Tab 45 at 16 (stipulated fact 3).

On May 30, 2019, Quest informed the DEA that the appellant's specimen A tested positive for marijuana.  IAF, Tab 16 at 18-21, 111, 114.  Quest confirmed the initial positive result using gas chromatography coupled to mass spectrometry (GC/MS).  IAF, Tab 42 at 6.  The confirmation testing revealed a positive result for the 9-carboxylic acid metabolite, a common metabolite of THC, with a quantitative concentration of 21 ng/mL.  IAF, Tab 16 at 14, 180; Tab 42 at 6.

During the week of May 27, 2019, the appellant contacted DEA Health Services Unit Chief Deborah Lary to explain that he did not use marijuana, but rather had used CBD oil products which may have caused the positive test result.  HT-1 (Lary); IAF, Tab 16 at 22.  Lary later related to the DEA's Office of Professional Responsibility (OPR) that the appellant had been "anxious to speak to someone about the positive test," and that she told the appellant the issue had been reported to OPR.  *Id.*

On or about May 31, 2019, the DEA requested a confirmatory test on appellant's specimen B by the Clinical Reference Laboratory ("CRL"), another HHS-certified laboratory. IAF, Tab 12 at 14. On that same date, OPR opened an investigation based on the appellant's "Failed Random Drug Test." IAF, Tab 16 at 2-15; Tab 45 at 17 (stipulated fact 7).

On or about June 9, 2019, CRL reported to the DEA that testing of the appellant's specimen B confirmed a positive result for the 9-carboxylic acid metabolite with a quantitative concentration of 18.5 ng/mL. IAF, Tab 16 at 114, 120-21, 127, 157, 165; Tab 42 at 6. CRL utilized liquid chromatography tandem mass spectrometry (LC-MS/MS) for the confirmation testing. IAF, Tab 16 at 114, 134-35; Tab 42 at 6.

On June 26, 2019, OPR interviewed the appellant regarding the positive test result. IAF, Tab 16 at 36-99. He denied marijuana use, but admitted to the consumption of various CBD products. *Id*. at 49-51, 78-79. He acknowledged his understanding that a CBD product "has to be .3 [percent] or less of THC in order for it to maintain that legal status," as well as his understanding that CBD products are not regulated by the Food and Drug Administration (FDA). *Id*. at 53 and 75. The appellant also told OPR inspectors he began using CBD products in or around February 2019 to assist with various physical ailments and anxiety. *Id*. 50-52, 63-71, 88; *see also* Tab 8 at 18-19; HT-2 (Armour).

During the OPR interview, the appellant provided inspectors with vials of the three CBD products he had purchased and used between December 2018 (when the 2018 Farm Bill was passed) and May 2019. HT-2 (Armour); IAF, Tab 16 at 37, 51-62, 169; Tab 45 at 17 (stipulated fact 8). All three of the products were manufactured by Balanced Health Botanicals and purchased by the appellant through a third-party retailer, CBDistillery. IAF, Tab 16 at 95-96, 98, 101-03, 108-10; Tab 47 at 28-30; Tab 48 at 4-6; HT-2 (Armour). The appellant kept the receipts and packaging for the CBD products because, as he told OPR inspectors,

> I took something that I felt was perfectly legal and I thought I would be okay. I didn't – I didn't think that I would be in this position. I felt that if something did happen, I'd have the opportunity to explain myself before – before maybe we got this far. You know, you hear some people say, oh, they ate a poppyseed bagel, or they tested positive for morphine or hydrocodone or heroin or something like that, and oh, you just show them a receipt of what you had and that clears it up.

IAF, Tab 16 at 76-77; HT-2 (Armour).

On June 21, 2019, Will Glaspy, then-Special Agent in Charge of the Houston Field Division, sent an email to all personnel in the office strongly discouraging the use of CBD products.   IAF, Tab 11 at 44.   The email read, in relevant part:  "[a]ll DEA employees need to be aware that if you use a CBD product you stand a good chance of testing positive for THC . . . which could lead to termination of employment if it is determined that the employee used illegal drugs."  *Id*. (emphasis in original).  This email appears to be the first official agency communication to employees in the Houston Field Division concerning the use of CBD products following the 2017 SAMHSA memorandum (referenced above) and the passage of the 2018 Farm Bill.

Between July 3, 2019, and July 24, 2019,[5] DEA Senior Forensic Chemist Dr. Elizabeth Guest, Special Testing and Research Laboratory, analyzed the three CBD product vials the appellant provided to OPR using gas chromatography/mass spectrometry, liquid chromatography, and nuclear magnetic resonance (NMR). HT-1 (Guest); IAF, Tab 16 at 169-79.   Dr. Guest holds a Ph.D in analytical chemistry and has been employed by the DEA as a forensic chemist for approximately 16 years.  HT-1 (Guest).

---

[5] The Chemical Analysis Reports for the three CBD product samples indicate the samples were received in the Special Testing and Research Laboratory on July 3, 2019, and reviewed by the "examiner" on July 8, 2019.  IAF, Tab 16 at 171, 174, 177. However, Dr. Guest signed each report on July 24, 2019, and Laboratory Director Jeffrey Comparin approved each report on August 6, 2019.  *Id*.

According to the Chemical Analysis Reports Dr. Guest prepared, one of the CBD products the appellant provided (CBDrop 2500, hereafter referred to as "Exhibit 1") tested at a THC level of 0.35 percent, with a margin of uncertainty of ± .08 percent.[6]  IAF, Tab 16 at 169-72; Tab 45 at 17 (stipulated fact 9).  The second CBD product, Mango Jolly Green Oil 625mg CBD Oil vaporizer (hereafter referred to as "Exhibit 2"), contained no THC.  IAF, Tab 16 at 169, 174-75; Tab 45 at 17 (stipulated fact 10).  The third and final CBD product, CBDrop 1000 (hereafter referred to as "Exhibit 3"), contained 0.21 percent THC with a margin of uncertainty of ± .05 percent.  IAF, Tab 16 at 170, 177-78; Tab 45 at 17-18 (stipulated fact 10).

On July 24, 2019, SAMHSA issued a memorandum to all Federal Agency Drug Program Coordinators, Federal Medical Review Officers, and Federal Partners regarding "Marijuana, Marijuana Oils, Marijuana Infused Products and Hemp Products."  *See* IAF, Tab 11 at 50-51.  Therein, SAMHSA advised that "federal agencies should make every effort to inform applicants and employees of the risk that using [CBD] products may result in a positive marijuana test."  *Id*. at 51.

On July 25, 2019, the DEA sent a 10-page "Daily Broadcast" email to all its employees.  IAF, Tab 46 at 77-86.  The email included an assortment of agency information concerning detail opportunities, news of current and former DEA employees, vacancies, and other administrative matters.  *Id*.  The last two pages of the Daily Broadcast included information in response to the question

---

[6] Dr. Guest testified that the uncertainty values were calculated based on both the actual results of the tests she conducted as well as historical testing results carefully collected by the DEA's Quality Control Section.  HT-1 (Guest); IAF, Tab 16 at 171, 174, and 177.  She further testified that this method of calculating the uncertainty value is a well-established standard within the DEA, as was the use of a 95 percent level of confidence.  HT-1 (Guest).  Dr. Guest added that the use of a margin of uncertainty was standard in the industry whenever "you quantify something," as she did in testing the THC purity level in Exhibit 1.  *Id*.

"Will Hemp and CBD Products cause a positive drug test?" *Id*. at 85-86. Lary testified she prepared the message by compiling information she obtained directly from the SAMHSA website. HT-1 (Lary). The Daily Broadcast email did not expressly caution or advise DEA employees not to use CBD products, however. IAF, Tab 46 at 77-86.

Between June 2019 and November 2019, OPR inspectors contacted at least three other individuals seeking additional information about possible testing methods that could distinguish between marijuana use and (exclusive) CBD use. *See* IAF, Tab 16 at 11, 14-15, 27-28, 31-33, 180-83. On June 10, 2019, OPR inspectors contacted Allen Breedlove, Federal Accounts Manager at eScreen, the DEA's Drug Testing Contractor. IAF, Tab 16 at 11, 31-33. Breedlove told inspectors that the urine test to which the appellant had been subjected could not identify the exact manner or product the appellant used to register a positive test for THC; rather, it could only indicate whether he "had more THC in his system than allowed by the Mandatory Guidelines under the Federal Drug-Free Workplace Program (DFWP)." *Id*. at 31.

On September 9, 2019, OPR inspectors spoke with Dr. Stephen Kracht, Medical Review Officer (MRO) at eScreen. IAF, Tab 16 at 14-15, 180-81. Dr. Kracht acknowledged his awareness that the appellant's positive (confirmation) test result measured at 21 ng/mL. *Id*. He noted that an individual would test positive for THC if the results were 15 ng/mL or higher, and opined there was no test available that could differentiate between a positive THC result caused by consumption of CBD products and one caused by "smoking a marijuana plant." *Id*. He further explained that the level at which the appellant tested positive did not favor whether he had used CBD oil or smoked/ingested marijuana. *Id*. at 180-81. Dr. Kracht also indicated that several factors could influence the results of a drug test, including: "how long ago the CBD and/or marijuana was ingested; how much was consumed; frequency in which it was consumed; and how much THC was diluted in the body." *Id*. Dr. Kracht further qualified his remarks by adding

that a drug test is merely "a snapshot of the blood at that particular moment so the THC count in the blood could have been on the rise or downfall depending on the circumstances." *Id*. at 181.

On November 4, 2019, OPR inspectors contacted Terrence Boos, DEA Drug and Chemical Evaluation Section Chief, who noted that many new products containing CBD had been introduced to the market at a fast pace, without proper labeling. IAF, Tab 16 at 15, 182-83.   These circumstances forced the FDA to get involved in the regulation of such products. *Id*. Boos further explained that THC "likes to pool in the body," which could cause CBD concentration to increase with frequent usage, resulting in a positive drug test. *Id*. Boos also related that his section had tested products below .30 percent THC and other products above .30 percent THC, and added that consumers also had the ability to consume CBD products by eating, drinking, and "vaping" them. *Id*. at 182-83. Moreover, individuals who utilize a combination of products could experience significantly increased CBD levels. *Id*. at 183.

Boos also outlined multiple concerns with elevated CBD levels in relation to the duties DEA Special Agents are required to perform. *Id*. First, he noted that elevated levels could potentially affect judgment with individuals who drive service vehicles or carry firearms. *Id*. He also indicated that an individual can take CBD products to mask and/or conceal marijuana use. *Id*. Boos further expressed there was no way to definitively determine whether a positive drug test (for THC) resulted from use of marijuana or exclusively CBD, and that it was very difficult to ascertain the exact percentage of CBD in the body because the drug tests used in laboratories include margins of uncertainty which could put the results under or over the .30 percent THC threshold. *Id*. Like Kracht, Boos noted that multiple variables impact THC percentage in the body, such as time, product strength, and an individual's metabolism. *Id*.

On November 15, 2019, the Chief Inspector of the DEA Inspection Division issued Chief Inspector's Bulletin No. 17 on "CBD Buyer Awareness" which stated (in relevant part),

> For DEA employees, the message is clear – the labels on CBD products are unreliable. The Inspections Division strongly recommends against the use of any CBD products. Use of such products is not a defense to a positive THC drug test. Additional policy guidance is forthcoming and will be disseminated DEA-wide once published.

IAF, Tab 11 at 47-48.

On November 27, 2019, OPR Inspector Lance Gibson submitted his final investigative report for review. IAF, Tab 16 at 10. On November 29, 2019, Senior OPR Inspector Dean Bobel reviewed the report, and on December 10, 2019, Associate Deputy Chief Inspector Bronwyn Haley approved the final report. *Id*.

On April 24, 2020, Kenneth Ludowig, Chairman of the DEA's Board of Professional Conduct, proposed the appellant's removal based on a charge of Use/Possession of Drugs. IAF, Tab 12 at 12-18; Tab 45 at 17 (stipulated fact 5). The notice advised the appellant of the reasons underlying the proposed action, his right to representation, and of the procedures and deadlines for reply. *Id*.

Also on April 24, 2020, the DEA amended two sections of its Personnel Manual, Section 2735.20(H) (Use of Alcohol and/or Drugs) and Section 2792.75 (Finding of Drug Use and Disciplinary Consequences). IAF, Tab 47 at 18-27. The sections were amended, at least in part, to clarify that employees who test positive for THC in a drug test after using CBD products will be subject to disciplinary action. *Id*. Specifically, the amendment to Section 2792.75 added the following:

> DEA employees, who, knowingly or unknowingly, use products containing cannabidiol (CBD) or hemp, and test positive to THC use in a drug test, will be subject to disciplinary action as described below. This includes CBD or hemp products purchased over-the-counter or online. For practical purposes, all extracts containing

CBD or hemp contain at least small amounts of other cannabinoids, including THC. It is not uncommon for some CBD and hemp products to contain as much as $1/10^{th}$ the THC concentration as marijuana. Therefore, quantities of CBD or hemp can leave enough THC in the user's system to trigger a positive drug test and possibly cause impairment, regardless of the ingestion method. Accordingly, employees are cautioned against the use of these products. Use of such products is not a defense to a positive THC drug test and the corresponding penalties listed in section 2792.75(d), below.

*Id*. at 25-26.

On May 29, 2020, the appellant, through counsel, submitted a request to Deciding Official (DO) Scott Sutherland to transfer his collected urine sample to the Laboratory Corporation of America Holdings ("LabCorp"), an HHS-certified laboratory, for a CBD/THC ratio test which could purportedly differentiate CBD use from marijuana use. IAF, Tab 8 at 82; Tab 51 at 19; HT-2 (McMillin). On June 26, 2020, Lary informed the appellant of the agency's decision to deny the request for additional testing. IAF, Tab 12 at 4-5.

On July 8, 2020, the appellant, through counsel, provided a written response to the proposed removal. IAF, Tab 12 at 18-71; Tab 45 at 17 (stipulated fact 6). On July 23, 2020, Sutherland issued his decision sustaining the charge and the appellant's removal, effective July 28, 2020. IAF, Tab 10 at 40-51. This appeal followed. IAF, Tab 1.

I conducted the hearing requested by the appellant. *See* IAF, Tab 62; HT-1 and HT-2. At the conclusion of the hearing, I left the record open to allow the parties to submit written closing briefs. IAF, Tabs 63, 65. The parties timely filed their briefs and the record closed. IAF, Tabs 66, 67.

<u>Legal Standards</u>

In an adverse action taken for cause pursuant to 5 U.S.C. § 7513, the agency has the burden of proving the merits of its charges by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B); 5 C.F.R. § 1201.56(b)(1)(ii).

In addition to proving its charges, the agency must also demonstrate the existence of a genuine nexus between the sustained charges and the efficiency of the service, and that the selected penalty was within the tolerable limits of reasonableness. *See LaChance v. Devall*, 178 F.3d 1246, 1253-59 (Fed. Cir. 1999); *Abbott v. U.S. Postal Service*, 121 M.S.P.R. 294, ¶ 10 (2014); *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981). As discussed below, the appellant must prove his asserted affirmative defenses by preponderant evidence. 5 C.F.R. § 1201.56(b)(2)(i)(C).

The agency proved its charge by preponderant evidence.

The proposal notice issued to the appellant set forth a single charge, Use/Possession of Drugs, accompanied by a narrative specification. IAF, Tab 10 at 42-43; Tab 12 at 14-18. The specification read, in relevant part,

> On May 21, 2019, you failed a random drug test when you tested posted positive for Marijuana. You were given a split urine specimen. Specimen A tested positive for marijuana and Specimen B tested positive for marijuana metabolite (Δ9-THCA).

> Specifically, on May 21, 2019, you were randomly selected to provide a urine specimen for a drug test. You failed the drug test. When questioned by OPR Inspectors regarding the products you used prior to the test, you stated, "*Two different products. They call it tinctures or drops and a vape.*" You submitted three (3) CBD Oil products you claim you previously used. When further questioned by OPR Inspectors why you thought you failed the drug test, you stated, "*A variety of reasons. The CBD Oil can be actual marijuana oil, or CBD derived from marijuana. If that's the case, it's going to have a – it's going have more than .3 percent THC.*" You tested positive for marijuana in sample A from your drug test and the metabolite THCA (tetrahydrocannabinol-carboxylic acid) in sample B from your drug test. According to the [SAMHSA], THCA is the Marijuana analyte tested in urine, and is a metabolite of THC (tetrahydrocannabinol), the primary psychoactive constituent of Marijuana. THC is not only a psychoactive compound found in Marijuana, but is a chemical that is routinely screened for in drug tests pursuant to the Mandatory Guidelines under the Federal Drug-Free Workplace Program (DFWP) [sic] Federal law identifies Marijuana as a Schedule I Controlled Substance.

> There is no way to distinguish whether your positive drug test was due to THC derived through the use of CBD Oil products or from smoking, ingesting, inhaling, or otherwise using marijuana. Your drug test shows positive for Marijuana and THCA.

IAF, Tab 12 at 14-15 (emphasis in original).  The narrative specification goes on to cite to various sections from the DEA Personnel Manual, including section 2735.20(H)(5)(6)(7), "Use of Intoxicating Beverages or Drugs." *Id.* at 15-16.  Of note, neither the specification nor the cited Personnel Manual sections reference drug possession.  The specification closed by stating the appellant's actions "as described above constitute **Use/Possession of Drugs**, and you are so charged." *Id.* at 16 (emphasis in original).

The appellant argues first that the charge must fail because the agency did not prove the elements of both "use" and "possession" of drugs, which he maintains it was required to do based on the charge label utilized by the agency. IAF, Tab 67 at 4-6.  To support this argument, he cites primarily to two decisions issued by the U.S. Court of Appeals for the Federal Circuit, *Burroughs v. Department of the Army*, 918 F.2d 170 (Fed. Cir. 1990), and *Chambers v. Department of the Interior*, 602 F.3d 1370 (Fed. Cir. 2010).  Those cases held that the Board cannot "split" a single unified charge into multiple independent charges, and then sustain just one of the newly-formulated charges to find the agency met its burden.  *Id.*  In other words, all elements of a charge must be proved or the entire charge fails.  *Burroughs*, 918 F.2d at 172.

In *Burroughs*, the appellant was charged with "directing the unauthorized use of Government materials, manpower and equipment for other than official purposes." 918 F.2d at 172.  The Board sustained the charge in part, finding the agency proved the work was unauthorized but declined to also find the work was done for other than official purposes.  *Id.*  The court reversed on appeal, finding the charge required proof of both the lack of authorization and other than official purposes, and thus the administrative judge erred by not requiring the agency to prove all elements of the charge.  *Id.*  The court also distinguished its holding

from a situation where more than one event or factual specification is set out to support a single charge, stating that "in that case, proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge." *Id.* (citing *Fiorillo v. United States Department of Justice, Bureau of Prisons*, 795 F.2d 1544 (Fed. Cir. 1986)).

In *Chambers*, the challenged removal included a charge (among several) of "[m]aking public remarks regarding security on the Federal mall, and in parks and on the [p]arkways in the Washington, D.C., Metropolitan area." *Chambers*, 602 F.3d at 1378. The administrative judge there found, and the Board affirmed, that the agency met its burden with respect to the charge when it proved that some of the disclosures made by the appellant were protected, and others were not.[7] *Id.* at 1374. The court disagreed, however, noting that separating protected statements from non-protected statements within a single charge and specification constituted impermissible charge-splitting. *Id.* It further articulated:

> We have explained that "[w]hen an agency proposes to discipline an employee, it must notify the employee of the conduct with which he is charged 'in sufficient detail to permit the employee to make an informed reply.'" *Lachance v. Merit Systems Protection Board*, 147 F.3d 1367, 1371 (Fed.Cir.1998) (quoting *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1148 (Fed.Cir.1997), and *Brook v. Corrado*, 999 F.2d 523, 526 (Fed.Cir.1993)). Agencies typically give this notice by designating a particular charge and accompanying the charge with a narrative description, the "specification," which sets forth the details of the charged misconduct. *Id.*

---

[7] The charge was supported by a single specification, but included several statements Chambers purportedly made to a reporter. *Chambers*, 602 F.3d at 1378. On appeal to the Board, she argued all of her public safety-related disclosures were protected under the Whistleblower Protection Act. *Id.* Chairman McPhie analyzed all of the statements attributed to Chambers by the reporter in the article, and found the first two statements (and other statements not listed) were protected, and found the third statement to be unprotected. *Id.* Vice Chairman Rose found all of Chambers' statements to be unprotected. *Id.* at 1379.

*Chambers*, 602 F.3d at 1379. Thus, it was fundamental to the appellant's due process in that case that the agency put her on notice of the specific conduct with which she was charged in sufficient detail that she was able to make an informed reply.

In resolving how a charge should be construed to determine the applicable elements of proof, the Board examines the structure and language of the proposal notice and the decision notice, as well as the accompanying circumstances. *See George v. Department of the Army*, 104 M.S.P.R. 596, ¶ 7 (2007), *aff'd*, 263 F. App'x 889 (Fed. Cir. 2008); *Tom v. Department of the Interior*, 97 M.S.P.R. 395, ¶ 17 (2004). The Board must also look to the specification(s) of a charge to determine the specific conduct the agency is relying on as the basis for its proposed action. *See Peterson v. Department of Veterans Affairs*, MSPB Docket No. CH-0752-12-0096-I-1, Final Order at 4 (Sept. 9, 2013) (citing *Lachance*, 147 F.3d at 1372).[8] Moreover, the Board has held that charges must be "viewed in light of the accompanying specifications and circumstances, and should not be technically construed." *See Robb v. Department of Defense*, 77 M.S.P.R. 130, ¶¶ 3-4 (1997) (citing *James v. Department of the Air Force,* 73 M.S.P.R. 300, ¶¶ 2-3 (1997)).

Turning to the present case, as an initial matter, I note the charge utilized by the agency was neither "Use <u>and</u> Possession of Drugs" nor "Use <u>or</u> Possession of Drugs." Rather, the charge was "Use/Possession of Drugs." *Id*. Given the use of such a "slash" charge, I determined it necessary to look beyond the charge label to the narrative specification in order to ascertain the specific misconduct with which the agency actually charged the appellant. In doing so, I find the

---

[8] Nonprecedential orders are not binding on the Board and have no precedential value, except under limited circumstances not applicable here. 5 C.F.R. § 1201.117(c)(2). Nevertheless, the analysis provided in the cited order is instructive.

charge at issue in this appeal distinguishable from the charges analyzed in *Burroughs* and *Chambers*.

A plain reading of the narrative specification that accompanied the charge reveals no reference to possession of drugs.  IAF, Tab 12 at 14-15.  Rather, the specification addressed the appellant's failed random drug test and the statements he made to OPR inspectors during the ensuing investigation about the potential cause(s) for the failed test.  *Id.*  Thus, in viewing the charge in light of the accompanying specification and circumstances, I conclude that the sole "act" charged by the agency was the use of illegal drugs based on the appellant's failed random drug test.  This determination is underscored by the *Douglas* Factor Form completed by Sutherland, which read in relevant part:  "[The appellant] received a verified positive test result which was positive for marijuana, a Schedule I controlled substance. On that basis, I find [the appellant] used illegal drugs." IAF, Tab 10 at 45.  Accordingly, I do not agree with the appellant that the charge required the agency to prove the elements of both drug use and drug possession.[9] IAF, Tab 61.  Further, I find the appellant received notice of the specific misconduct with which the agency charged him in sufficient detail that he was able to make an informed reply to the proposed removal.

When an agency relies on a positive drug test to take an adverse action against an employee, the agency must prove the validity of that test by preponderant evidence.  *See Forte v. Department of the Navy*, 123 M.S.P.R. 124, ¶ 8 (2016) (citing *Boykin v. U.S. Postal Service*, 51 M.S.P.R. 56, 58 (1991)); *see also Holton v. Department of the Navy*, 123 M.S.P.R. 688, ¶ 11 (2016).  To meet its burden, the agency must prove that the urine sample that tested positive was the appellant's by showing the chain of custody was properly maintained and

---

[9] In reaching this conclusion, I also reject the appellant's arguments that the agency was required to prove that Exhibit 1 was a controlled substance, as defined by the Controlled Substances Act, or that the appellant knowingly or intentionally possessed a controlled substance.  IAF, Tab 68.

verified.  *See Forte*, 123 M.S.P.R. 124, ¶ 8.  Executive Order 12564, which authorizes the testing of Federal employees for illegal drug use, provides that "[p]ositive drug test results may be rebutted by other evidence that an employee has not used illegal drugs."  *See id.*, ¶ 21 (citations omitted).

The DEA's Personnel Manual, Section 2792.75(B)(3), states that "[a]n employee may be found to use illegal drugs on the basis of any appropriate evidence including, but not limited to . . . a verified positive test result."  IAF, Tab 47 at 27.  This section provided Sutherland a basis by which to sustain the charged misconduct, and also placed the appellant on notice that his verified positive drug test result could be considered evidence of illegal drug use.  As explained further below, the appellant's verified positive drug test, combined with his admitted use of over-the counter CBD products that contained THC, was sufficient to meet the agency's burden.

The appellant did not challenge the validity of his drug test results or the chain of custody of the samples he provided.  IAF, Tab 54 at 4.  Further, Dr. Gwendolyn McMillin, his expert witness, testified at hearing that she had no concerns with the validity of the tests conducted on the appellant's urine specimens.  HT-2 (McMillin).  With regard to the chain of custody, the evidence shows, and Sutherland's testimony supports, that the specimen identification number on the appellant's urine specimens matched the numbering on Quest's testing of specimen A and CRL's testing of specimen B.  IAF, Tab 16 at 19-21, 29, 114; Tab 60, at 21; HT-1 (Sutherland).

Sutherland testified that, in evaluating the charge, he considered:  the positive/verified drug test result; the Chemical Analysis Report for Exhibit 1, which showed that it may or may not have been an illegal substance based on the THC percentage and corresponding margin of certainty; and the Chemical Analysis Reports of the other two CBD products the appellant provided to OPR.  HT-1 (Sutherland).  He testified that he also fully considered the appellant's claim that the positive test result was caused solely by his use of CBD products

over the course of several months.  HT-1 (Sutherland).  Setting aside for a moment the question of whether or not the agency was required to permit the appellant to refute the positive test result through additional third-party testing, I find Sutherland properly concluded the charge was supported by preponderant evidence.

As stated, the appellant admitted that, between February 2019 and May 2019, he regularly used two of the CBD products he provided to OPR during its investigation.  HT-2 (Armour).  The appellant consistently maintained that he legally purchased and used commercially available CBD products, and did not ingest marijuana or any other illegal drugs during the period in question.  *Id*.  He testified that he performed extensive research before purchasing or using any CBD products to ensure the company from which he purchased was reputable and marketed their products as legal (*i.e.*, as containing less than 0.30 percent THC).  *Id*.  He further testified he was drawn to CBD products because (1) he had heard they were effective for treating conditions such as "anxiety, depression, pain, arthritis, a whole host of ailments," and (2) he suffered adverse reactions in the past to over-the-counter anti-inflammatory drugs.  *Id*.  He added that, as a federal law enforcement officer, he was aware that the use of CBD products was illegal prior to the passage of the Farm Bill.  *Id*.  He also testified he was aware that questions had been raised by the public regarding CBD products, and that the DEA was unable to provide much guidance given the lack of regulatory guidance in place at the time.  *Id*.

Regarding the Chemical Analysis Report for Exhibit 1, Sutherland testified he reviewed the testing data compiled by the Special Laboratory, which determined the THC "substance purity" of the product was 0.35, with a margin of uncertainty of $\pm$ .08 percent.  *Id*.  This meant that while the "raw data" THC percentage for the product was measured at 0.35, the margin of uncertainty provided for an overall range between 0.27 and 0.43 percent THC.  HT-1 (Sutherland and Guest).  Sutherland was aware that, to be considered hemp (and

thus a legal substance) pursuant to the 2018 Farm Bill, a CBD product had to contain less than 0.30 percent THC.  HT-1 (Sutherland).  Therefore, the range resulting from the margin of uncertainty suggested Exhibit 1 could be determined to be either (legal) hemp or (illegal) marijuana.  *Id*.

Sutherland acknowledged he is not a scientist or chemist, and was not provided with instructions as to how to apply the margin of uncertainty to the evidence presented to him.  HT-1 (Sutherland).   But he realized he could not ignore the margin.  *Id*.  Therefore, he employed his own "unscientific" approach by halving the margin of uncertainty for Exhibit 1, from ± .08 percent to ± .04 percent, in order to shrink the range from between 0.27 and 0.43 percent to between 0.31 and 0.39 percent THC.  *Id*.  Based on this modified margin, the entirety of the uncertainty range was above the 0.30 percent threshold, and Sutherland concluded the positive result was valid because, even if the appellant's use of Exhibit 1 was the cause of the positive result, Exhibit 1 more likely than not contained THC percentage above 0.30.  *Id*.

The appellant argues Sutherland misapplied the margin of uncertainty in multiple respects.  First, he contends the modified range utilized by Sutherland skewed the scientific data to his prejudice.  Next, he contends that, under 7 C.F.R. § 990.1, a product that includes a THC concentration of 0.30 within its distribution or range is within the acceptable hemp THC level, even if a portion of the range falls above the allowable threshold.  IAF, Tab 61 at 14-15.

Addressing the second claim, the agency correctly notes that while 7 C.F.R. § 990.1 defines terms under the Department of Agriculture's Domestic Hemp Production Program, it is not part of the 2018 Farm Bill.  IAF, Tab 67 at 8.  Moreover, that regulatory provision expressly states that its definition of "acceptable hemp THC level" does not affect either the statutory definition of hemp in the 2018 Farm Bill, or the definition of marijuana found in the Controlled Substances Act.  *Id*.  Thus, I find the regulation's definition of hemp of limited relevance to this issue or appeal.

Although Sutherland's methodology was undeniably flawed from a scientific perspective, he was not required to determine Exhibit 1 was a controlled substance in order to sustain a charge based on the positive drug test. Rather, he considered the Chemical Analysis Reports as they related to the appellant's claim that his positive result was caused solely by his use of legal CBD products, and not by his ingestion of an illegal substance.  IAF, IAF, Tab 54; Tab 61 at 5-6.

The appellant also argues Sutherland incorrectly concluded that the positive test result was caused by marijuana use, and that the agency improperly denied his request to allow an outside laboratory to test his urine sample to distinguish CBD use from marijuana.  I address this particular claim in the affirmative defenses section below.

Even accepting as truthful all of the appellant's testimony regarding his research and use of CBD products, I nonetheless find the agency proved its charge.  The appellant had available to him information the product he was using contained some amount of an illegal drug (e.g., it was purchased from an online retailer, the label said it contained THC, and he understood that, despite the conflict between state and federal law, he was bound by federal law), and he assumed the risk that the product could actually contain more than 0.30 percent THC notwithstanding claims made on the product label.

In sum, I find the appellant's positive drug test, admission to using CBD products, and the chemical analysis results reflecting Exhibit 1 contained a percentage of THC that potentially exceeded the limits established by the Farm Bill is sufficient to meet the agency's burden.

The charge is SUSTAINED.

Affirmative Defenses

The appellant asserts multiple affirmative defenses.  First, he contends the agency's denials of his requests to transfer his urine sample to LabCorp for

additional testing violated his "due process and procedural rights." IAF, Tabs 8, 56, 68. Next, he avers the agency violated his right to due process by failing to provide him "sufficient notice of the specifications on which it relied in reaching the decision," and/or "sufficient notice of the charge when it did not identify the specific charge of possession of drugs." *Id*. Finally, he alleges the agency's decision to remove him was motivated by discrimination based on disability, as demonstrated by the deciding official's purported hostility towards his use of CBD products to treat his medical conditions. *Id*. I address each of these claims in turn.

<u>The appellant did not prove the agency committed harmful procedural error or violated his right to due process.</u>

Under 5 U.S.C§ 7701(c)(2)(A), the Board may not sustain an action if the appellant shows harmful error in the application of the agency's procedures. To prove harmful procedural error, the appellant must prove that the agency committed an error in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error. 5 C.F.R. § 1201.4(r). The burden is upon the appellant to show that the agency committed an error and that the error was harmful, *i.e.*, that it caused substantial prejudice to his rights. *Id*.; 5 C.F.R. § 1201.56(b)(2)(i)(C).

Where a public employee has a property interest in continued employment, the government cannot deprive him of that interest without due process, which requires notice and a meaningful opportunity to respond. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538 (1985). The need for a meaningful opportunity to respond is important for two reasons. First, an adverse action will often involve factual disputes, and consideration of the employee's response may clarify such disputes. *Stone v. Federal Deposit Insurance Corporation*, 179 F.3d 1368, 1376 (Fed. Cir. 1999) (citing *Loudermill*, 470 U.S. at 546). Second, even

where the facts are clear, the appropriateness or necessity of the proposed action may not be clear. *Id.* (citing *Loudermill*, 470 U.S. at 543). Thus, "the employee's response is essential not only to the issue of whether the allegations are true, but also with regard to whether the level of penalty to be imposed is appropriate." *Id.* Due process requires that "notice of charges be sufficiently detailed to provide a meaningful opportunity to reply." *Ryan v. Department of Homeland Security*, 123 M.S.P.R. 202, ¶ 8 (2016) (citing *Rawls v. U.S. Postal Service*, 94 M.S.P.R. 614, ¶¶ 19-21 (2003) *aff'd*, 129 F. App'x 628 (Fed. Cir. 2005)).

Due process is a threshold issue, and the Board cannot make alternative findings that assume no due process violation. *Boss v. Department of Homeland Security*, 908 F.3d 1278, 1284 (Fed. Cir. 2018). Thus, where there is a due process violation "the merits of the adverse action are wholly disregarded and the administrative judge must simply reverse the agency's action without proceeding to make alternative findings." *Giannantonio v. U.S. Postal Service*, 111 M.S.P.R. 99, ¶ 5 (2009); *see also Ward v. U.S. Postal Service*, 634 F.3d 1274, 1278 (2011) (holding that if the appellant proves a due process violation, the Board does not apply a harmful error test; rather, the employee is automatically entitled to a new constitutionally proper removal proceeding).

As discussed below, I conclude the appellant did not meet his burden to prove the agency committed a harmful procedural error or violated his right to due process.

Denial of Requests for Outside Testing

The appellant argues the agency violated his due process and procedural rights when it denied his requests for the release of his urine specimen B to an outside laboratory to perform testing that could purportedly differentiate between the use of CBD products and marijuana use. IAF, Tabs 45, 61, 68. To support his claims, he cites to provisions found in Executive Order (EO) 12564, *Drug-*

*free Federal workplace*, (Sept. 15, 1986), the DEA Planning and Inspection Manual, the Mandatory Guidelines, and the Medical Review Officer (MRO) Guidance Manual. *Id.* I separately address his claims in relation to each identified source.

EO 12564

The parties identified the following sections from the EO as relevant to the issues in this appeal. Section 5(e):

> The results of a drug test and information developed by the agency in the course of the drug testing of the employee may be considered in processing any adverse action against the employee or for other administrative purposes. Preliminary test results may not be used in an administrative proceeding unless they are confirmed by a second analysis of the same sample or unless the employee confirms the accuracy of the initial test by admitting the use of illegal drugs.

Tab 13 at 6-7. Section 5(f):

> The determination of an agency that an employee uses illegal drugs can be made on the basis of any appropriate evidence, including direct observation, a criminal conviction, administrative inquiry, or the results of an authorized testing program. Positive drug test results may be rebutted by other evidence that an employee has not used illegal drugs.

*Id.* at 7. Finally, section 7(c):

> For purposes of this Order, the term "illegal drugs" means a controlled substance included in Schedule I or II, as defined by section 802(6) of Title 21 of the United States Code, the possession of which is unlawful under chapter 13 of that Title. The term "illegal drugs" does not mean the use of a controlled substance pursuant to a valid prescription or other uses authorized by law.

*Id.* at 8.

The appellant argues the agency violated the EO and his due process rights by denying him the opportunity to rebut his positive test result through additional testing, and also by relying on a positive test result that was caused by CBD oil, a legal substance, and not an illegal drug. IAF, Tab 8 at 6-7; Tab 68 at 42. Regarding the first argument, the record reflects the agency determined the

appellant used illegal drugs based on appropriate evidence – the positive result obtained through an authorized testing program, as required by section 5(f). The preliminary test result analyzed by Quest was confirmed through a second analysis performed by CRL, as required by section 5(e). The appellant thereafter denied the use of marijuana, and offered evidence to rebut the positive test and the adverse action, which included his contention that the positive result was caused by legal CBD products. The agency in turn conducted a thorough investigation of the positive result and the appellant's contentions, which included testing of the products he provided to support his position. Unfortunately for the appellant, one of those products was analyzed to contain more than the legal amount of THC, with a margin of uncertainty.

The EO does not expound on the types of rebuttal evidence which are permissible or prohibited, nor does it proscribe specific procedures or rights with respect to obtaining or requesting rebuttal evidence. Rather, the EO simply states that an employee *may* rebut positive results by other evidence. *Id*. Therefore, I find the agency afforded the appellant the opportunity to rebut the positive drug test, and Sutherland testified that he gave due consideration to the appellant's rebuttal evidence. HT-1 (Sutherland). Accordingly, I find the appellant has not shown the agency erred with regard to the process contemplated by the EO.

To the extent the appellant contends the agency committed harmful error by relying "on a flawed conclusion to reach an impaired result" because the appellant's CBD use was "authorized by law" as delineated in section 7(c) of the EO, *see* IAF, Tab 8 at 17, I disagree. The "conclusion" the agency relied on was the appellant used illegal drugs based on the positive drug test. The rebuttal evidence he provided included use of a product that may or may not have been "authorized by law" given the amount of THC analyzed in the product. The agency was not required to also show impairment as a result of drug use.

In sum, the record demonstrates the agency conducted a random test as part of an authorized drug program, followed all required testing procedures, and

relied on the results of the properly-administered test to determine the appellant used illegal drugs.  The agency also considered the appellant's rebuttal evidence. Accordingly, I do not find the appellant proved the agency erred or violated his due process rights in relation to EO 12564.

## DEA Planning and Inspection Manual

The appellant next cites to the following provision from the agency's Planning and Inspection Manual to support his affirmative defenses:

> All investigations must be thoroughly planned to ensure objectivity. Planning should be directed toward exploring every possible facet of the allegation, all possible explanations, and minimization of unnecessary apprehension and injury to the subject's reputation.  A PR Senior Inspector will establish and maintain a dialog with assigned field personnel, and assure that the inquiry is complete. Incomplete investigations will not be accepted by PR[.]

IAF, Tab 8 at 7.  The appellant argues the agency failed to explore "all possible explanations" when it denied his request for additional testing, and thus committed harmful error and/or denied him due process.

I find the appellant's argument lacks merit here, and in reaching that conclusion I noted the use of the terms "planning" and "should" in the above provision.   These terms are suggestive of the overall goal for agency investigations – thoroughness – rather than implying the creation of investigation requirements or procedural "rights" for the subject of an investigation. Moreover, I determined that the investigation conducted by the agency in response to the appellant's drug result was thorough, well-planned, and complete. Therefore, I find the agency complied with its manual to the extent it was required to do so, and the appellant was not deprived of substantive or procedural rights in relation to the manual.

SAMHSA Mandatory Guidelines

The Mandatory Guidelines include multiple sections which are relevant to the appellant's claims.   First, section 2.6 addresses the release of a urine specimen:

> Entities and individuals subject to these Guidelines under Section 1.1 may not release specimens collected pursuant to Executive Order 12564, Public Law 100-71, and these Guidelines to donors or their designees. ***Specimens also may not be released to any other entity or individual unless expressly authorized by these Guidelines or by applicable federal law***. This section does not prohibit a donor's request to have a split (B) specimen tested in accordance with Section 13.8.[10]

IAF, Tab 12 at 52 (emphasis added).

Section 3.3(a) of the Mandatory Guidelines discusses the use of collected specimens for "other purposes":

> Specimens collected pursuant to Executive Order 12564, Public Law 100-71, and these Guidelines must only be tested for drugs and to determine their validity in accordance with Subpart C of these Guidelines. ***Use of specimens by donors, their designees, or any other entity, for other purposes (e.g., deoxyribonucleic acid, DNA, testing) is prohibited unless authorized in accordance with applicable federal law.***

*Id*. at 53 (emphasis added).

Section 3.5 of the Mandatory Guidelines specifically addresses additional drug and/or specimen validity tests by an HHS-certified laboratory at the request of the Medical Review Officer (MRO):

> ***An HHS-certified laboratory is authorized to perform additional drug and/or specimen validity tests on a case-by-case basis as***

---

[10] Section 13.8 of the Mandatory Guidelines, referenced in section 2.6, states that "[f]or a positive . . . result reported on a primary (A) specimen, a donor may request through the MRO that the split (B) specimen be tested by a second HHS-certified laboratory to verify the result reported by the first HHS-certified laboratory."   IAF, Tab 12 at 76. This was already done in this case, however, as CRL performed confirmation testing on the appellant's specimen B to verify the positive result reported by Quest on his specimen A.   Therefore, the applicability of this section is minimized.

***necessary to provide information that the MRO would use to report a verified drug test result (e.g., tetrahydrocannabivarin, specimen validity tests using biomarkers). An HHS-certified laboratory is not authorized to routinely perform additional drug and/or specimen validity tests at the request of an MRO without prior authorization from the Secretary or designated HHS representative, with the exception of the determination of D, L stereoisomers of amphetamine and methamphetamine.*** All tests must meet appropriate validation and quality control requirements in accordance with these Guidelines.

*Id.* (emphasis added).

Reading these sections together, the appellant argues "there is nothing in the Mandatory Guidelines that precluded the Agency from directing its [MRO] to contact Quest and *ask* that it transfer Appellant's sample to another HHS-certified laboratory – LabCorp – for further testing." IAF, Tab 68 at 38 (emphasis in original). Even if that were true, however, I find the appellant identified no provisions in the Mandatory Guidelines or other applicable federal law that expressly *required* the agency, or the MRO, to do so. Therefore, I find the appellant failed to establish the agency committed harmful procedural error vis-à-vis the Mandatory Guidelines, or denied him due process in relation to the same.[11]

MRO Guidance Manual

The appellant next cites to the MRO Guidance Manual, at section 3.1.5, which states that the MRO is permitted to request retesting of a primary specimen in specific circumstances. IAF, Tab 37 at 37; Tab 68 at 39-41. Those limited circumstances include "[w]hen a federal agency has requested reanalysis as part of a legal or an administrative proceeding to defend an original positive,

---

[11] The appellant also argues that Quest, not the agency, was the appropriate authority to decide whether it could transfer his sample to another HHS certified laboratory. IAF, Tab 68 at 39. I find this argument lacks support in the text of the Mandatory Guidelines.

adulterated, or substituted result," or "[w]hen additional test information on a positive result may be useful to the MRO in determining the final test result." IAF, Tab 37 at 37. The Manual further provides, as an example of this latter circumstance, "the use of a test for the presence of Δ9-tetrahydrocannabivarin (THCV) to confirm the use of cannabis as opposed to pharmaceutical THC." *Id*. The MRO Guidance Manual adds on this point:

> A prescription medication that also produces positive tests for cannabinoids is dronabinol. The active ingredient of this product is THC and is available as Marinol® . . . . When a donor claims to have a prescription for dronabinol, the MRO should allow the donor the opportunity to provide the supporting documentation. A valid prescription for dronabinol is a legitimate medical explanation for a positive THCA result.

*Id*. at 71.

The appellant contends there is a "clear parallel" between the THCV test performed to distinguish between pharmaceutical THC (dronabinol/Marinol) use and marijuana and the LabCorp ratio test he sought to distinguish CBD use from marijuana use. *See* IAF, Tab 68 at 40. This argument, however, ignores language in section 5.2 of the MRO Guidance Manual which specifically indicates that a valid prescription for Marinol can be a legitimate explanation for a positive THCA test result, while "[c]ompounds or substances that have not been approved by FDA cannot be used as a legitimate medical explanation." IAF, Tab 37 at 71-72. The MRO Manual further states at section 7.1.2: "When a donor claims that his/her positive THCA test was due to ingestion or use of a legal hemp product, the MRO may not accept such explanations as a legitimate explanation for a positive THCA test result." *Id*. at 95. As noted throughout this decision, CBD products were at all times relevant to this appeal unregulated by the FDA; therefore use of such products could not be used as a legitimate medical explanation under the MRO Guidance Manual.

Moreover, even if I agreed the MRO had the *discretion* to request that Quest release the appellant's specimen to LabCorp for additional testing, as with

the Mandatory Guidelines discussed above, the appellant identified no provisions in the MRO Guidance Manual or any other source which *required* the agency to do so. Therefore, because the appellant failed to identify any specific policies or procedures which required the agency to request the release of his specimen for additional/independent testing, or to direct Quest to release the specimen to the appellant for additional testing, I do not find that the agency committed error or denied him due process based on requirements set forth in the MRO Guidance Manual.

Due Process Argument under *Ramirez* and *Banks*

The appellant also contends that in denying his requests to conduct additional testing on his specimen, "the Agency denied him a meaningful opportunity to review and challenge the evidence underlying his removal – his positive drug test for marijuana." IAF, Tab 68 at 42. The appellant cites to *Ramirez v. Department of Homeland Security*, 975 F.3d 1342 (Fed. Cir. 2020), for the proposition that "when a government agency removes its employees based on drug charges established through urinalysis, due process requires that the employees have access to samples of the urinalysis for independent verification." *Ramirez*, 975 F.3d at 1350 (citing *Banks v. Federal Aviation Administration*, 687 F.2d 92, 94-96 (5th Cir. 1982)). Some additional background information as to how the court reached that statement, which was not central to its holding, is instructive.

The court summarized that the Department of Homeland Security had removed Ramirez, based on a charge of failure to maintain a condition of employment, after he was permanently restricted from employment in a position requiring the use of a weapon. *Ramirez*, 975 F.3d at 1344. The permanent restriction stemmed from a domestic incident during which Ramirez allegedly pointed a firearm at his wife's head, and followed two psychiatric evaluations ordered as a result of the incident. *Id.* at 1344-45. The result of the first

evaluation was inconclusive, and the second evaluation, while also inconclusive, included a recommended restriction based on Ramirez's "lack of full cooperativeness" during his evaluation. *Id*. at 1345. Both psychiatric evaluations relied on a written assessment, a version of the Minnesota Multiphasic Personality Inventory (MMPI).[12] Neither evaluating psychiatrist interpreted the MMPI assessments himself; rather, the assessments were tabulated and interpreted by a third-party clinical psychologist who compiled a report for the psychiatrists' reviews. *Id*. Both evaluating psychiatrists concluded Ramirez had been uncooperative during his evaluations with them based on the third-party's interpretation of the MMPI assessments. *Id*.

The decision sustaining Ramirez's removal cited to the second psychiatric evaluation which recommended the permanent restriction, but not to the MMPI assessments or the interpretations of the same. *Id*. Ramirez challenged the removal through arbitration, and the arbitrator issued a final award affirming the action.

Ramirez raised several arguments in his petition to the court. In particular, he argued he was not afforded due process in challenging the basis for removal in light of the agency's refusal to provide him with access to the records of his MMPI assessments. *Id*. at 1349. On this point, the court stated it "had not previously decided whether and when due process requires a government agency to provide its employee with the records of psychological testing underlying an adverse fitness-for-duty evaluation that leads to the employee's removal." *Id*. at 1350. However, it then noted that "[i]n comparable circumstances, the Fifth Circuit has held that when a government agency removes its employees based on drug charges established through urinalysis, due process requires that the

---

[12] The MMPI is a test frequently used to aid in the diagnosis of mental disorders, and each assessment consisted of a series of true-or-false questions about the subject's emotions, attitudes, thinking, and behaviors. *Ramirez*, 975 F.3d at 1345.

employees have access to samples of the urinalysis for independent verification." *Id*. (citing *Banks*, 687 F.2d at 94-96).

The *Banks* case, in turn, involved two Air Traffic Control Specialists (ATCSs) who were suspected of drug usage and "asked" to submit for drug screenings. *Banks*, 687 F.2d at 93. The ATCSs complied with the request and provided samples with the understanding that they would be tested for drug usage. *Id*. Testing of their samples was performed by a private laboratory, and after both individuals tested positive for cocaine, the FAA removed them for use of a prohibited substance. *Id*. On review to the Board, their attorney requested production of the lab samples for independent inspection and testing. *Id*. The FAA denied the request, noting it had allowed the proprietary laboratory to dispose of the samples. *Id*. The Board sustained the removals. *Id*.

On appeal, the court reversed the order of the Board and remanded the case. *Id*. It noted in its holding:

> There can be no doubt in this case that it was crucial to [the ATCSs] to have had their laboratory samples available for independent testing. Both employees denied any use of drugs. They contend that it is illogical to believe they would have submitted voluntarily to a drug screen if they had been taking drugs. The record shows no criminal charges and that the supervisor's suspicions were highly speculative at best. The only persuasive evidence of drug usage was the laboratory tests. Under these circumstances the controllers insist that due to the importance of the test results, the urine samples should have been preserved and made available in discovery proceedings.

> The government contends that alternative avenues were available to challenge the accuracy of the laboratory results. Specifically, the director of the independent testing laboratory was available for cross-examination. The general testing methods were described and open to challenge. The non-availability of the samples for independent testing, according to the FAA, was not a serious shortcoming and does not violate due process guarantees. We cannot agree with such a casual treatment of the procedural rights of governmental employees.

> . . . .

> The laboratory tests here were the only meaningful evidence resulting in the discharges. The accuracy of those tests, including the possibility that the samples were mixed-up, damaged, or even inaccurately tested, was the likely determinant of the entire case. Indeed, challenging the laboratory reports was probably the only way the controllers could succeed in their appeal.
>
> The opportunity to cross-examine the laboratory director falls far short of substituting for the samples themselves. He obviously would be a highly antagonistic witness in any challenge of the laboratory results. But, as Davis states in his Administrative Law Treatise, 2d ed., s 12:1: "A party whose interest is protected by due process is entitled to opportunity for a trial-type hearing on disputed adjudicative facts, except when inspection or testing is deemed a better method for finding the disputed facts...."

*Id.* at 94-95.

Both *Ramirez* and *Banks* remain good caselaw. However, I find the facts in this case to be more much aligned with another Federal Circuit case, *Grimsrud v. Department of Transportation*, 902 F.3d 1364 (2018), in which the court found the agency complied with its due process requirements in regard to a positive drug test removal, and distinguished *Banks*:

> I respectfully disagree with the dissent's suggestion that our precedent, MSPB precedent, and the Fifth Circuit's decision in [*Banks*], demonstrate Grimsrud's entitlement to additional testing of his urine specimen for drugs and DNA.[13] We have never held that due process requires such testing. In sustaining the employee's removal in *Meza v. Department of Homeland Security*, 275 F. App'x 987 (Fed. Cir. 2008), we noted that the AJ had granted a motion to compel the agency to provide an aliquot of the urine specimen for DNA testing, but the propriety or necessity of the AJ's grant of the motion was not passed on by the panel. In *Storm v. Department of Army*, while the MSPB recognized that "an agency's procedural error may constitute harmful error when it effectively destroys, or precludes an appellant from acquiring, the only available evidence

---

[13] Judge Newman, joined by Judge Wallach, authored a dissenting opinion in *Grimsrud*, in which she argued Federal Circuit, Board precedent, and *Banks* required that the employee was entitled to additional testing of his urine specimen for drugs and DNA as a matter of due process. *Grimsrud*, 902 F.3d at 1368-72.

by which he can show that the agency likely would have reached a different conclusion in the absence of its error," it did not find any such error had occurred. 64 M.S.P.R. 14 (1994) (citing *Banks*, 687 F.2d at 96). In *Ivery v. Department of Transportation*, 96 M.S.P.R. 119 (2004), the MSPB did not sustain the employee's removal where the agency failed to follow the prescribed split-specimen protocol. It is undisputed that the agency followed that protocol in Grimsrud's case. *Banks*, which was decided prior to the implementation of the split-specimen protocol, is factually distinguishable, and subsequent decisions demonstrate that no testing beyond that performed was required here.

Assuming arguendo that we should apply *Banks*, the DOT complied with its requirements in this case. In *Banks*, two air traffic controllers contested their removal based on a single positive drug test conducted by a private laboratory that had not preserved the samples for retesting. The Fifth Circuit held that "due process required an opportunity by the controllers to test on their own behalf to evaluate the accuracy of the government-sponsored tests." 687 F.2d at 96.

In contrast, Grimsrud's specimen was not destroyed, and he availed himself of the agency's procedure permitting additional drug testing of the specimen following a positive result. Grimsrud could have selected any HHS certified laboratory to perform the testing on Bottle B.

. . . .

Thus, Grimsrud had "an opportunity ... to test [the sample] on [his] own behalf to evaluate the accuracy of the government-sponsored tests." *Banks*, 687 F.2d at 96. Due process does not require unlimited testing, and *Banks* did not hold to the contrary.

. . . .

[] Grimsrud had "alternative means of demonstrating [his] innocence." *Id.* He took advantage of those means by presenting evidence and cross-examining witnesses at the MSPB hearing, including challenging the chain of custody in an attempt to raise doubt as to whether the specimen was his and "attempt[ing] to raise doubts in the mind of the factfinder whether the test was properly administered." *Id.*; *see also Trevino v. Dahm*, 2 F.3d 829, 832 (8th Cir. 1993) ("As long as the defendant has an adequate opportunity to impeach the reliability of a scientific test, and the qualifications of the person administering the test, due process is not implicated by a

state's good faith failure to preserve a sample for independent testing."); *United States v. Boyd*, 961 F.2d 434, 437 (3d Cir. 1992) (holding no due process violation based on routine destruction of urine specimen prior to defendant's ability to independently test it where defendant "had other means by which to challenge the evidence").    The AJ's rejection of Grimsrud's fact-specific challenges and credibility determinations are not an appropriate subject for *en banc* review.

Due process also does not require the agency to make Grimsrud's specimen available for DNA testing.  The relevant regulations, HHS Mandatory Guidelines, and DOT drug testing procedures make clear that DNA testing of DOT urine specimens is not permitted.

*Grimsrud*, 902 F.3d at 1366-67.

As in *Grimsrud*, I find the agency afforded the appellant the due process to which he was entitled.   Again, initial testing performed by Quest revealed a positive result, and confirmation testing done by a different HHS-certified laboratory, CRL, confirmed the result.   Thus, like Grimsrud, the appellant obtained verification of the initial positive test by another HHS-certified laboratory.  As the court stated, due process does not require unlimited testing, nor does it entitle an employee to obtain their sample to perform any test of their choosing as there is no indication that the second test referenced in *Grimsrud* differed in nature from the initial test; rather, it was a confirmation test similar to the one CRL performed on the appellant's specimen B.

Based on the foregoing, I do not find the Federal Circuit's decisions in *Ramirez* or *Banks* entitled the appellant to any process beyond what he received from the agency.

<u>Sufficiency of Notice</u>

The appellant also raises harmful procedural error and due process claims concerning the sufficiency of the notice he received from the agency as to the charge and specifications upon which it relied in its removal decision.   IAF, Tab 68.  While I addressed these claims in the charge section above, I briefly reiterate the claims and my analysis here.

First, the appellant avers he was not aware that Sutherland considered Exhibit 1 to be a controlled substance until he reviewed the deciding official's *Douglas* factor analysis and hand-written notes supporting his decision. *Id.* at 43-44. As such, he argues (1) the agency failed to provide him notice that he was being charged with use and possession of a controlled substance, and (2) the agency considered charges and specifications not included in the April 24, 2020, notice of proposed removal. *Id.* at 44. Thus, he contends the agency committed harmful procedural error and denied him due process based on the insufficiency of notice he received. *Id.*

In a related claim, the appellant asserts that "the [a]gency's position on the elements of possession—as explained by the [deciding official] for the first time during the March 16, 2021 hearing—is a further due process violation." *Id.* at 44-45. More directly, he alleges that if the agency intended to charge him with possession of drugs "with elements other than those in the Controlled Substances Act, it was required to so inform him," and its failure to do so deprived him the opportunity to make an informed reply. *Id.* As noted above, the elements under the CSA include a showing that the appellant knowingly or intentionally possessed a controlled substance. IAF, Tab 68.

Due process requires the agency provide an employee with notice of the charges against him, an explanation of the employer's evidence, "and an opportunity to present his side of the story." *Maroney v. Department of the Air Force*, MSPB Docket No. DA-15-0594-I-1, Remand Order, ¶ 13 (Aug. 4, 2022). A deciding official does not commit a due process violation when he considers arguments raised by an appellant in response to proposed adverse action and rejects those allegations in reaching a decision. *Grimes v. Department of Justice*, 122 M.S.P.R. 36, ¶¶ 12-13 (2014). Further, the Board has explained an employee is not entitled to know the particular weight the deciding official will attach to his arguments raised in response to the proposed adverse action in advance of the final decision. *Id.*, ¶ 13 (citing *Wilson v. Department of Homeland Security*, 120

M.S.P.R. 686, ¶ 12; *cf. Harding v. U.S. Naval Academy*, 567 F. App'x. 920, 925-26 (Fed. Cir. 2014) (the appellant was "not deprived of due process by not being advised in advance that the deciding official might draw [an] inference from the nature of the charged conduct")).

Sutherland reviewed and considered the same evidence file that was provided to the appellant, and the appellant did not argue that Sutherland considered information or evidence outside that file. Sutherland testified that he considered the appellant's positive drug test for marijuana, a Schedule I controlled substance, to be sufficient evidence to prove the charge of use/possession of drugs. HT-1 (Sutherland). However, before reaching his decision he gave due consideration to the appellant's claim that the positive test result was caused solely by his use of legal CBD products, and he also considered the additional analysis of those products performed by the agency's chemist. *Id*. As noted throughout this decision, Exhibit 1 was analyzed as containing above the legal threshold of THC with a margin of uncertainty. Further, as noted above, the agency was not required to prove either that Exhibit 1 was a controlled substance or that the appellant possessed a controlled substance in order to meet its burden with respect to the charge.

Therefore, I find that, in his analysis of the evidence presented to him, Sutherland considered and rejected the arguments the claims the appellant raised in response to the proposed adverse action. Thus, under *Grimes*, Sutherland did not commit a due process violation. Moreover, under *Wilson*, the appellant was not entitled to know the particular weight Sutherland would attach to his arguments raised in response to the proposed adverse action in advance of the final decision.

Concerning the "possession" of drugs portion of the charge, I previously discussed my conclusion that the agency based its charge solely on the positive drug result, that is, the appellant's use of drugs; thus, the agency was not required to prove both use <u>and</u> possession of drugs. After reviewing the decision notice,

the *Douglas* Factor form, and Sutherland's hearing testimony, I find that Sutherland clearly determined that the positive drug test was sufficient evidence of the appellant's use of illegal drugs, and thus sufficient to prove the charge. His consideration of the appellant's "possession" was, at most, ancillary to the drug use as demonstrated in his hearing testimony:

> Well, I think here [it is] common meaning that the use of drugs is evidenced by the positive drug test. Possession in this case would -- we find possession would be based on the logical conclusion that you can't use a drug without having possessed it, absent any other, you know, being a criminal act I suppose.

HT-1 (Sutherland). He further testified that the positive test result demonstrated use, "[a]nd as I said before, by logical extension, the possession would be inferred." *Id.*

After reviewing the evidence, I find the agency provided sufficient notice to the appellant of the charge, and the evidence upon which it was based, in order to afford him the opportunity to make an informed reply. Sutherland did not commit a due process violation when he considered and rejected arguments raised by the appellant during the reply period, and the appellant was not entitled to know the particular weight Sutherland attached to his arguments in advance of the final decision. *Grimes*, 122 M.S.P.R. 36, ¶ 13; *Wilson*, 120 M.S.P.R. 686, ¶ 12. Accordingly, I reject the appellant's claims that the agency deprived him due process, or committed harmful procedural error, in relation to the notice it provided to him.

## The appellant failed to establish disability discrimination.

The appellant also alleges his removal was the result of discrimination based on perceived disability in that it "implicates the medical information and treatment prongs of the Rehabilitation Act." IAF, Tab 8 at 25; Tab 45 at 6. More specifically, he asserts that he meets the definition of an individual with a disability, and the agency took a prohibited action against him based on the form

of treatment he chose to utilize for his disability.[14]  IAF, Tabs 8, 56, 68.  His claim is premised on the contention that his CBD use was "a legal treatment for his disability."  IAF, Tab 8 at 6.[15]

There are three general theories of disability discrimination: reasonable accommodation, disparate treatment, and disparate impact.  The appellant testified that he never requested, or required, accommodations from the agency for any of his injuries or impairments.  HT-2 (appellant).  Further, he did not identify a specific employment practice or policy that, while neutral on its face, disproportionately impacted members of a protected class which includes the appellant.  Therefore, to the extent the appellant is asserting claims of failure to accommodate or disparate impact, I conclude he failed to prove those claims by preponderant evidence.  *See Hidalgo v. Department of Justice*, 93 M.S.P.R. 645, 653 (2003); *Stern v. Federal Trade Commission*, 46 M.S.P.R. 328, 333 (1990).  Therefore, I analyze whether the appellant proved disparate treatment.

To establish a claim of disability discrimination, the appellant must first show that he suffers from a disability. Pursuant to the Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (ADAAA), the appellant may prove he has a disability by showing he (1) has a physical or mental impairment that substantially limits one or more major

---

[14] The appellant later clarified his discrimination claim as follows:  "if [Sutherland] reflexively determined that the use of CBD itself was improper because he determined it was not an effective way to treat pain from physical impairments, then that would violate the Rehabilitation Act."  IAF, Tab 61 at 6.  In his closing brief, he also averred Sutherland harbored a "hostility" towards the use of CBD products, and thus attacked the manner in which the appellant chose to treat his impairments.  IAF, Tab 68 at 47.

[15] The appellant makes general references to 29 U.S.C. § 791 *et seq.*, 29 C.F.R. § 1630.2(g), and a U.S. District Court case, *Johnson v. Bennett Auto Supply*, 319 F. Supp. 3d 1278, 1286 (S.D. Fla. 2018).  IAF, Tab 8 at 6.  I considered the references cited by the appellant and do not find them relevant or persuasive as to his affirmative defense.

life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1), 29 C.F.R. § 1630.2(g)(1),(2),(3).

An impairment is considered to be a disability if it substantially limits an individual's ability to perform a major life activity as compared to most people in the general population.  *See* 29 C.F.R. § 1630.2(j)(1)(ii).  Major life activities include, but are not limited to, activities such as caring for oneself, performing manual tasks, eating, lifting, bending, concentrating, communicating, and working.  *See* 42 U.S.C. § 12102(2).  An individual need not prove that he is significantly restricted in order to show that a disability substantially limits a major life activity.  *See* 42 U.S.C. § 12101 note.  Further, an impairment that substantially limits one major life activity need not limit another, and one that is episodic or in remission is a disability if it would substantially limit a major life activity when active.  The definition of disability is construed in favor of broad coverage.  *See* 42 U.S.C. § 12102(4)(A); *see also* 29 C.F.R. § 1630.2(j)(1)(i) (the term "substantially limits" is construed broadly in favor of expansive coverage and is not meant to be a demanding standard).

The ADAAA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ."  *See* 42 U.S.C. § 12112(a); *Pridgen v. Office of Management & Budget*, 2022 MSPB 31, ¶ 38 n.11; *Sanders v. Social Security Administration*, 114 M.S.P.R. 487, 495 (2010).  The ADAAA defines "qualified individual," in part, to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *See* 42 U.S.C. § 12111(8).

The appellant asserts he qualifies as an individual with a disability under the "regarded as" prong.  IAF, Tab 8.  An individual meets the requirement of being "regarded as having such an impairment" if he establishes that he has been subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a

major life activity. This category covers individuals who are not disabled but who are regarded as disabled by others who have an effect on the individual's employment. *Camacho v. Department of the Army*, MSPB Docket No. SF-0752-10-0967-I-4, Final Order, ¶ 15 (August 25, 2014) (citing *Keown v. Crowell*, EEOC Appeal No. 01943171, 1995 WL 517042 at *6 (Aug. 24, 1995) ("[I]n a case where a complainant is alleging that s/he was regarded as having a disability, the focus is on the employer's state of mind.")). Further, the "regarded as" category applies to those who "do not in fact have the condition which they are perceived as having." *Camacho*, ¶ 15 (citing *Groshans v. Department of the Navy*, 67 M.S.P.R. 629, 639 (1995)).

The appellant testified he endures near constant pain related to various injuries he sustained during his college football career (between 1992 and 1997). IAF, Tab 8 at 21; HT-2 (appellant). He stated that during his football career, he "played with numerous concussions (CTE likely), shoulder, hand and back injuries, and also had emergency gastrointestinal surgery (internal bleeding from extended use of anti-inflammatory medication)." *Id*. Additionally, the appellant stated he was diagnosed with various work-related medical conditions between 2010 and 2018, including acute stress reaction, anxiety, acute cervical sprain, neck pain, chronic pain, and low back pain. IAF, Tab 8 at 22. Finally, he stated he has been diagnosed with "stress disorder, traumatic, acute," and insomnia, and depression. *Id*. He contends these "impairments are permanent and qualify as a disability-related condition" under the Rehabilitation Act of 1973. IAF, Tab 8 at 21.

The appellant offered other evidence regarding his impairments. Among that evidence is a Form DEA-325, Medical History and Examination, prepared by examining physician Dr. Marvin Abrams on October 22, 2015, in relation to a physical exam he conducted of the appellant on that date. IAF, Tab 48 at 17-21. The form makes no mention of chronic or recurring pain associated with joint or back injuries, depression, or headaches, but there are notations concerning

reported heart palpitations associated with anxiety, a history of surgeries on "both knees in college," and elevated cholesterol. *Id*. at 18, 19. Based on the report of palpitations, Dr. Abrams recommended the appellant see a cardiologist. *Id*. at 20.

The agency, through Lary, requested additional information from the appellant's primary care provider regarding the appellant's report of palpitations. IAF, Tab 8 at 166. In response, the appellant provided a letter from a physician assistant, dated December 18, 2015, noting the appellant's "mild anxiety" and "remote history of heart palpitations associated with anxiety," which was exhibited in three episodes over a two-year period. *Id*. at 167. The letter also noted a "recent normal ekg" and "no physical/duty restrictions." *Id*.

At the hearing, the appellant stated he "assumed" he reported the same conditions during both the 2015 physical examination and his subsequent physical examination for the agency, around 2017 or 2018. HT-2 (appellant). The appellant did not provide records of any other physical examinations, but he did provide other medical records which reflect he was diagnosed with the various medical conditions he described in his testimony and pleadings, along with other conditions not mentioned. IAF, Tab 49 at 4-33.[16] He acknowledged, however, that he did not provide any medical records to the agency prior to his removal. HT-2 (appellant).

While I recognize the definition of disability must be construed in favor of broad coverage under the ADAAA, I do not find the appellant established he is an individual with a disability under any of the three prongs identified above. As noted, the record shows the appellant was diagnosed with various medical

---

[16] The appellant provided medical records in addition to those cited above, *see* IAF, Tab 49 at 34-51, Tabs 50-51, however, he did not offer those records into evidence at the hearing. I advised the parties both during the prehearing conference and at the hearing that my initial decision would only consider those proposed hearing exhibits that were offered and admitted into evidence during the hearing. *See* IAF, Tabs 54, 64. Accordingly, I only considered the medical records admitted at the hearing.

conditions (both physical and psychological); however, not every individual who has an impairment is disabled under disability discrimination law. *See Fitzgerald v. Department of Defense*, 85 M.S.P.R. 463, 467 (2000). In this regard, the record fails to show that any of the appellant's impairments substantially limit one or more major life activities.

I further find he appellant does not qualify as disabled under the "regarded as" definition because he failed to show anyone at the agency, and specifically anyone who has an effect on his employment, perceived him as disabled. Sutherland testified that the appellant offered, in his reply to the proposed removal, that he used CBD because he believed that it would be effective "in addressing some of the other physical ailments that he had described, such as knee pain, back pain, shoulder pain, things of that nature, as a result of playing football for years and also had job-related things from – that are inherent with being a special agent." HT-1 (Sutherland). However, that appeared to be the extent of Sutherland's familiarity with the appellant's medical conditions. Moreover, Sutherland testified that he "did not consider that [the appellant] had a disability," nor did he have any direct knowledge of the appellant's identified impairments. *Id*.

Finally, I find the evidence does not show the appellant has a documented history of an impairment that substantially limits one or more major life activities. As discussed above, the record evidence corroborates the appellant's testimony that he was diagnosed with various medical conditions. However, the appellant did not show by preponderant evidence that those conditions substantially limited his ability to perform a major life activity as compared to most people in the general population. Further, even assuming the appellant did have a record of an impairment that substantially limited his ability to perform a major life activity as compared to most people in the general population, he acknowledged the agency had little information or records regarding his condition(s) aside from the physical examination records and the supplemental

information he provided in 2015 at Lary's request. IAF, Tab 8 at 166-67. As noted above, the one examination record found in the record does not establish the appellant as disabled.

Even if I found the appellant was disabled within the meaning of the ADAAA, I find he was not treated disparately due to his condition. If an appellant proves he has a disability, he must then prove the agency's decision was motivated by it, and to obtain full relief, he must show that the disability discrimination was a but-for cause of the personnel action. *Pridgen*, 2022 M.S.P.B. 31, ¶ 40.[17] The methods by which an appellant may prove a claim of disability discrimination are: (1) direct evidence; (2) circumstantial evidence, which may include (a) evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," also known as "convincing mosaic"; (b) comparator evidence, consisting of "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment received systematically better treatment"; (c) evidence that the agency's stated reason for its action is "unworthy of belief, a mere pretext for discrimination" (i.e., the burden-shifting standard under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); and (3) some combination of direct and indirect evidence. *Pridgen*, 2022 M.S.P.B 31, ¶ 24.

---

[17] On September 12, 2022, the Board issued a precedential decision in *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, in which it clarified the separate standards of proof and the methods by which an appellant may prove discrimination claims under Title VII. *See id.* Specifically, an appellant may receive injunctive, forward-looking relief if he shows that Title VII discrimination was a "motivating factor" in the employment action at issue. *Pridgen*, 2022 MSPB 31, ¶ 21 (citing *Babb v. Wilkie*, 140 S.Ct. 1168, 1173-74 (2020)). In order to obtain full relief under the statute, including status quo ante relief, an appellant must show that such discrimination was a "but-for" cause of the employment outcome. *See id.*, ¶ 22.

The appellant contends "[u]nder the Rehabilitation Act of 1973, it is improper for management officials to substitute their own judgment and impose their own personal beliefs, on the form of treatment one is taking for known disabilities." IAF, Tab 68 at 46. Without further elaboration or case citation, I discerned the appellant is attempting to parallel the facts of this case to a situation where a supervisor substitutes his judgment for that of an employee's health care provider in relation to the effectiveness of an accommodation. To the extent he is making such an argument, I find there is no evidence Sutherland questioned the *effectiveness* of CBD products to alleviate the pain associated with the appellant's ailments, or that he viewed such products as a form of accommodation.

Moreover, the record does not support the appellant's underlying contention that Sutherland harbors hostility or prejudice towards the general use of CBD products. In fact, when questioned at the hearing, Sutherland credibly denied holding such an absolute intolerance. HT-1 (Sutherland). Rather, he testified that illegal drug use in general is wholly incompatible with the duties required of a DEA special agent, and he questioned the appellant's judgment with regard to consuming an unregulated product knowing the potential risks. *Id*. Sutherland provided this testimony within the specific context of the appellant's positive drug result, and the decision he made to remove him on the basis of that result. Thus, I do not conclude the record supports a conclusion that Sutherland believes all agency employees who consume CBD products should be removed.

Based on the evidence presented, I do not find the appellant established that a disability, or perceived disability, was a motivating factor in the agency's decision to remove him. Accordingly, the appellant failed to meet his burden concerning disability discrimination.

<u>The agency established nexus between the misconduct and the efficiency of the service.</u>

The agency next must prove that there is a sufficient nexus between the charged misconduct and the efficiency of service. *Hall v. Department of the Air Force*, 16 M.S.P.R. 341, 342 (1983). To do so, it must establish a clear and direct relationship between the articulated grounds for the adverse action and either the appellant's ability to accomplish his duties satisfactorily or some other legitimate government interest. *Canada v. Department of Homeland Security*, 113 M.S.P.R. 509, ¶ 10 (2010); *Merritt v. Department of Justice*, 6 M.S.P.R. 585, 596 (1981), *modified by*, *Kruger v. Department of Justice*, 32 M.S.P.R. 71, 75 n.2 (1987). An agency may establish nexus by showing that the employee's conduct (1) affected his or his coworker's performance; (2) affected management's trust and confidence in the employee's job performance; or (3) interfered with or adversely affected the agency's mission. *Canada*, 113 M.S.P.R. 509, ¶ 11.

The Board has consistently held that disciplinary action is warranted based on a sustained charge of drug use. *See Zazueta v. Department of Justice*, 94 M.S.P.R. 493 (2003), *aff'd*, 104 F. App'x 166 (Fed. Cir. 2004); *Patterson v. Department of the Air Force*, 77 M.S.P.R. 557, 564 (1998). This is true even when the drug use occurred off duty. *Rice v. Department of the Treasury*, 998 F.2d 997, 999-1000 (Fed. Cir. 1993).

Sutherland testified he considers illegal drug use, as established by the appellant's positive and verified drug test, to be wholly incompatible with the appellant's position as a DEA Special Agent. HT-1 (Sutherland). He referenced the DEA as a "singular mission Agency" charged solely with enforcement of the Controlled Substances Act. *Id*. Further, the DEA is a law enforcement entity and Sutherland noted that drug use is "very problematic for people charged with the enforcement of drug laws." *Id*. He added that the public holds special trust in DEA agents like the appellant to faithfully perform the duties associated with the position to keep drugs off the streets and the public safe. *Id*.

The appellant argues that removal does not promote the efficiency of the service because, to the extent Exhibit 1 contained more than the legal amount of THC, his use of an illegal substance was inadvertent.[18]   IAF, Tab 68.   He referenced research and expert witness testimony suggesting that positive drug tests could result solely from use of CBD products (as opposed to marijuana), and further argued that the relatively low concentration levels analyzed in his urine samples suggested his positive result was not caused by marijuana use.   *Id*.   He also asserted that any potential nexus is diminished by his continued performance of his duties during the period between the date of his positive result and removal (approximately 14 months), and cited numerous letters of support he received from colleagues and managers.   *Id*.

On the balance, however, I find the nature of the charged conduct directly conflicts with the agency's mission, and thus there is a genuine nexus between the sustained charge and the efficiency of the service.

<u>The agency established the penalty of removal was within the bounds of reasonableness.</u>

Where all the charges are sustained, the Board will review the penalty imposed by the agency only to determine if it considered all relevant factors and exercised management discretion within the tolerable limits of reasonableness. *See, e.g.*, *Singletary v. Department of the Air Force*, 94 M.S.P.R. 553, ¶ 9 (2003), *aff'd*, 104 F. App'x 155 (Fed. Cir. 2004); *Douglas*, 5 M.S.P.R. at 305-306.   The Board has enumerated a non-exhaustive list of factors that may be relevant to a determination of discipline in a particular case, among them the employee's past disciplinary record and past work record, the effect of the offense upon his ability

---

[18] The appellant never raised a claim of inadvertent ingestion, and there is no indication in the record that he unknowingly consumed any products containing marijuana. Rather, he contends that he relied on the veracity of the CBD product labels.   HT-2 (appellant).

to perform at a satisfactory level, the clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question; any mitigating circumstances surrounding the offense; and the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Douglas* at 305-306. However, the Board will consider, "first and foremost, the nature and seriousness of the misconduct and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or was frequently repeated." *Gaines v. Department of the Air Force*, 94 M.S.P.R. 527, ¶ (2003).

I reviewed Sutherland's *Douglas* factor analysis as described in his *Douglas* Factor Review Form and during his hearing testimony. IAF, Tab 10 at 55-51; HT-1 (Sutherland). Overall, I find Sutherland gave fair and adequate consideration to his penalty selection. He identified the nature and seriousness of the offense, coupled with the appellant's position as a law enforcement officer[19] charged with enforcing the Federal government's drug laws, as the most significant aggravating factors he considered. *Id.* He also considered the appellant's 2018 one-day suspension for unrelated misconduct as an aggravating factor. In mitigation, Sutherland considered the appellant's lengthy Federal service (sixteen years), outstanding performance, and letters of support from colleagues and supervisors. *Id.* However, he ultimately concluded the appellant lacked potential for rehabilitation because of the seriousness of the offense and the poor decision-making the appellant exhibited by consuming an unregulated product without due consideration for the potential ramifications. *Id.*

The appellant challenged the validity of Sutherland's consideration of the applicable *Douglas* factors. HT-2 (appellant); IAF, Tab 68. While I considered

---

[19] It is well-settled that law enforcement officers may be held to a higher standard of conduct than other Federal employees. *See, e.g.*, *O'Lague v. Department of Veterans Affairs*, 123 M.S.P.R. 340, ¶ 20 (2016).

the entirety of the appellant's claims, I address only his main points of contention.

The appellant first argued the agency failed to provide adequate notice about the potential consequences of CBD use with respect to drug testing and potential discipline.   IAF, Tab 68 at 33-36.   As detailed at length in the background section of this decision, the agency undisputedly had information about such consequences as early as November 2017 when SAMHSA published its memorandum to "Federal Agency Drug Program Coordinators, Federal Medical Review Officers, and Federal Partners." IAF, Tab 12 at 30-31.   That memorandum advised that "CBD products may contain other cannabinoids such as THC, therefore, use of CBD oils and marijuana-derived products may result in a positive urine drug test for THCA." *Id.*   There is no indication, however, that Houston Field Office employees were made aware of the potential risks and consequences of CBD use prior to Glaspy's email to them in late June 2019 – nearly one month after the appellant's positive test result.   IAF, Tab 11 at 44.   Further, the Daily Broadcast message addressing the potential risks associated with CBD use was not distributed to DEA employees until late-July 2019.   IAF, Tab 46 at 77-86.

Sutherland extensively discussed the "clarity of notice" factor in his *Douglas* factor analysis; however, he made no mention regarding notice of the risks and consequences specifically associated with the use of CBD products. *See* IAF, Tab 10 at 48-50.   Rather, Sutherland cited to various portions of the DEA Personnel Manual which addressed use of intoxicating beverages and drugs, employee standards of conduct, drug tests, and the consequences of a positive test. *Id.*   Nonetheless, I find the appellant had some awareness that CBD use could potentially result in a positive drug result, and in reaching this conclusion I placed significance on the extensive knowledge and resources available to the appellant as an experienced DEA Special Agent.   Further, it is undisputed the appellant was aware that he was prohibited from using marijuana, even though it

had been legalized in certain states (not including Texas) and hemp had been legalized through the passage of the 2018 Farm Bill.  HT-2 (appellant).  He was also aware that THC remained illegal, and acknowledged knowing that (1) CBD products were not regulated by the FDA, and (2) CBD products had to contain less than 0.30 percent THC in order to be considered legal.  *Id*.  For that reason, he testified, he diligently researched CBD products and retailers before purchasing and using those products.  *Id*.  However, he also admitted that he made no attempt to seek guidance from supervisors or any other DEA resources before consuming CBD products.[20]  *Id*.  He also acknowledged that he saved the receipts, packaging, and bottles of the CBD products he purchased and consumed because he felt "it would be smart" to keep them should an issue later arise.  The appellant's own testimony makes clear he was on notice that use of THC is prohibited, and he was knowingly consuming unregulated products that may have contained THC.  On the whole, I find Sutherland's consideration of the "notice" factor was reasonable.

The appellant also contends the penalty of removal was unreasonable in light of his lengthy service record and outstanding performance; the lack of any indicia of illegal drug use, such as unexplained absences, late arrivals, or inconsistent performance prior to his positive test result; numerous letters of support he received from colleagues and supervisors which were provided to the deciding official as part of his reply; and his general character and integrity. IAF, Tab 11 at 60-71; Tab 68.  I agree that these factors are mitigating and Sutherland considered them as such.

---

[20] Given the nature of the agency's mission, the appellant was questioned at hearing as to why he did not seek guidance about CBD products from agency officials before he began consuming them.  HT-2 (Armour).  He testified that he chose not to disclose to agency personnel why he was taking CBD products, but admitted that he never experienced any stigma at the agency in relation to CBD product use.  *Id*.  He also acknowledged that he probably could have sought guidance without disclosing private medical information.  *Id*.

The Board has reversed administrative judge decisions that mitigated removals based on positive drug tests. For example, in *Zazueta*, the employee, a Border Patrol Agent, was cross-designated to enforce federal drug laws, but tested positive for amphetamine and methamphetamine. *Zazueta*, 94 M.S.P.R. 493, ¶¶ 2, 4, 8. The Board agreed with the agency that Zazueta's drug use was in "direct conflict with his drug interdiction duties" as a law enforcement officer, and reversed the administrative judge's decision to mitigate the removal. *Id.*, ¶¶ 4, 12. I recognize the facts presented by this case are more complex than those presented by *Zazueta*; however, both cases involved positive and verified drug results for a Federal law enforcement officer directly charged with enforcing Federal drug laws.

After considering all of the evidence in the record, I find the agency properly considered the relevant *Douglas* factors, and I find no reason to disturb the penalty. *See Biniak v. Social Security Administration*, 90 M.S.P.R. 682, ¶ 15 (2002). Accordingly, I sustain the appellant's removal.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:        ___/S/_____

Daniel Yehl
Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **November 3, 2022**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and

may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## **Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim.  The date of filing by mail is determined by the postmark date.  The date of filing by fax or by electronic

filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document.  The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions

about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) **Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain

judicial review of this decision—<u>including a disposition of your discrimination</u> <u>claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this</u> <u>decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding</u> <u>all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision</u> <u>becomes final</u> as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx